OHIO COUNCIL 8, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, Appellant,

v.

KENT STATE UNIVERSITY et al., Appellees.

[Cite as *Ohio Council 8, Am. Fedn. of State, Cty. & Mun. Emp., AFL-CIO v. Kent State Univ.* (1994), 93 Ohio App.3d 728.]

Court of Appeals of Ohio,
Franklin County.

No. 93APE08-1097.

Decided March 29, 1994.

Ronald H. Janetzke, for appellant.

Millisor & Nobil and Thomas D. Rooney, for appellee Kent State University.

Lee Fisher, Attorney General, and William J. Neville, Assistant Attorney General, for appellee State Employment Relations Board.

PETREE, Judge.

This is an R.C. 119.12 appeal from the Franklin County Court of Common Pleas, which affirmed the order issued by appellee, the State Employment Relations Board ("SERB"). SERB's order held that appellee Kent State University ("Kent State") did not commit an unfair labor practice by reasonably applying the existing terms of a collective bargaining agreement to a group of five parking facility attendants who were added to the bargaining unit a year after the agreement went into effect. Appellant, Ohio Council 8, American Federation of State, County and Municipal Employees, AFL–CIO ("AFSCME"), which is the employee organization representing the subject bargaining unit and the five parking facility attendants, challenges SERB's ruling by assigning that the common pleas court (1) erred in finding that the order of SERB was supported by substantial, reliable and probative evidence; (2) erred in finding that Kent State was not obligated to negotiate wages, hours, and conditions of employment of classifications accreted into a bargaining unit by order of SERB; and (3) erred in finding that the collective bargaining agreement was not modified by Kent State and that Kent State applied it exactly as it was negotiated.

These assignments of error present one issue for our review. That issue is whether SERB abused its discretion in determining that an employer could apply an existing collective bargaining agreement to employees accreted into the

collective bargaining unit covered by agreement, so long as the application of the agreement is manifestly reasonable. Because we find the legal standard formulated by SERB for accretions by unit amendment does not constitute an abuse of discretion under R.C. Chapter 4117, we affirm.

I

The basic facts of this case have been stipulated and are undisputed. A collective bargaining agreement went in effect between Kent State and AFSCME for February 4, 1987 through February 4, 1990.[1] During the negotiation of this contract, Kent State promulgated classification specifications to supplant the ones in existence under applicable civil service law. These new contractual classifications were not actually negotiated with the union but were implemented subject to the union's right to grieve should Kent State drastically change someone's job. No such grievance was ever filed to challenge the specifications themselves.

The classifications were broad guidelines of work to be performed in a particular job and did not include the university's policies and procedures. Commencing in 1987, Kent State promulgated the specifications for non-bargaining unit employees as well. Kent State issued such specifications for the attendants in question on February 25, 1988.

In addition, as part of the 1987 contract negotiations, Kent State implemented a negotiated wage plan to supplant the wage structure of the previously applicable civil service system. Under that state system, employees were entitled to yearly longevity supplements and step increases. In contrast, under the 1987 contract, effective February 4, 1987, the supplements and step increases were abolished and bargaining unit employees instead received yearly percentage increases and a one-time $500 bonus. Thereafter, bargaining unit employees were to receive a four percent wage increase the following year and a five percent increase in 1989. All bargaining unit employees in civil service pay grades one through seven retained the same or lower numerical wage rate under the contract wage plan. Of course, non-bargaining unit employees remained under the civil service wage plan.

The year after the collective bargaining agreement went into effect, both AFSCME and Kent State filed a joint petition with SERB seeking to amend the bargaining unit certification to add parking facility attendants to the list of employees described and therefore covered by the agreement. At the time, there were five such attendants and the unit itself covered approximately three

---

1. Although the collective bargaining agreement has expired, no party has raised the issue of mootness before this court.

hundred fifty employees overall. SERB authorized the change about a month later.

Unfortunately, a dispute then arose about how to treat the newly added attendants. After the accretion, Kent State sought to apply the existing terms of the agreement to the accreted employees. Indeed, the university notified the attendants that they were now part of the subject bargaining unit and even sent them copies of the governing collective bargaining agreement. Accordingly, consistent with its treatment of other pay grade one through seven bargaining unit employees, Kent State "slotted" the civil service pay grade 3 attendants into pay grade 3 under the collective bargaining agreement wage plan. However, Kent State took the position that the attendants should not receive the nine percent wage increase and bonus for 1987 or the four percent wage increase for February 1988. The attendants were not subject to the agreement at the time of those increases. It is undisputed that instead of the contract wage increases, the attendants received civil service wage plan increases.

Moreover, after the accretion, Kent State discontinued free laundry service for attendants' uniforms, which had previously been cleaned at Kent State's expense prior to the accretion. At this time, about three hundred bargaining unit employees wore uniforms, but only food service workers were provided clean uniforms daily by the Kent State under the contract. Attendants wore machine washable slacks and shirts in summer but their winter jackets had to be dry cleaned. However, no other unit members received jackets like them as part of the required uniform. Like all other workers, attendants had to keep their clothes clean and presentable.

Additionally, the university implemented a policy change for vehicle inventory procedures. Prior to 1988, attendants performed only a visual inventory of articles in vehicles before towing. In March 1988, just before being amended into the unit by SERB, and consistent with the procedures required for Kent State police officers, the inventory procedure was changed to require attendants to actually physically enter the car, with or without a uniformed police officer present. Though attendants raised concerns about their legal authority to break into cars and about their personal liability to car owners, Kent State told the attendants that it was to the attendants' benefit because now car owners could not complain that attendants had stolen items, which complaints had been lodged in the past. Kent State also gave its assurances that attendants had no personal liability for this new procedure and that Kent State would defend any complaint arising out of the procedure. Further, the attendants were given instruction on these procedures and received self-defense training before implementation of the new policy in March 1988.

As a consequence, AFSCME requested by letter that Kent State negotiate with regard to the foregoing changes in wages, hours and conditions of employment for the attendants. However, Kent State refused to negotiate mid-term. AFSCME pursued the grievance arbitration mechanism of the contract to obtain relief, but the labor arbitrator found there was no duty to bargain on these facts. This was upheld on appeal by the Eleventh District Court of Appeals.

AFSCME then filed an unfair labor practice charge with SERB, raising the same issues. After considering the stipulated record, SERB found that Kent State had been justified in treating the accreted workers as bargaining unit members with whom Kent State did not have to bargain regarding terms covered by the existing contract. Though AFSCME appealed this order to the Franklin County Court of Common Pleas under R.C. 119.12, the common pleas court found that the board's order was supported by reliable, probative and substantial evidence in accordance with law. The matter was then appealed to this court.

## II

AFSCME contends in its assignments of error that the existing collective bargaining agreement did not contemplate the bargaining interests of the five parking attendants and was totally silent on the terms and conditions of employment which the parties were to abide by after accretion. AFSCME contends that under *Lorain City Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 533 N.E.2d 264, Kent State had a mandatory duty to bargain mid-term with AFSCME over anything affecting the bargaining unit and clearly illegally refused to do so on several counts. Specifically, AFSCME argues that Kent State should have negotiated the wages and bonus owed to the attendants, should have negotiated the abolition of free laundry service for attendant uniforms and should have negotiated the change in vehicle inventory policy.

In *State Emp. Relations Bd. v. Adena Local School Dist. Bd. of Edn.* (1993), 66 Ohio St.3d 485, 491–492, 613 N.E.2d 605, 610, the majority opinion of the Supreme Court of Ohio succinctly summarized the established standards of judicial review for SERB unfair labor practice orders, as follows:

"In *Lorain City Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 259–261, 533 N.E.2d 264, 266–267, this court explained that different standards of review are to be applied by a common pleas court and by a court of appeals when reviewing an order of SERB in a ULP case. When a common pleas court reviews a SERB order, the court must determine whether the order is supported by substantial evidence in the record. This standard of review for a common pleas court is supplied by R.C. 4117.13(D), which provides that '[t]he findings of the board [SERB] as to the facts, if supported by substantial evidence,

on the record as a whole, are conclusive.' *See Lorain City Bd. of Edn., supra,* at 259, 533 N.E.2d at 266.

"An appellate court, on the other hand, plays a more limited role than a trial court in reviewing the same SERB order. The role of the appellate court is to determine whether the trial court has abused its discretion. The appellate court must affirm the judgment of the trial court if no abuse of discretion occurred. *Id.,* 40 Ohio St.3d at 260–261, 533 N.E.2d at 267."

Though due deference is owed to SERB decisions within the scope of its delegated discretion, we must note that the Supreme Court has recently once again recognized the limitations of this mainstay of judicial review in *State ex rel. Ohio Assn. of Pub. School Emp./AFSCME, AFL–CIO v. State Emp. Relations Bd.* (1992), 64 Ohio St.3d 149, 152, 593 N.E.2d 288, 291. There the court wrote:

"This court normally accords great deference to a decision SERB has made on a particular issue. 'It was clearly the intention of the General Assembly to vest SERB with broad authority to administer and enforce R.C. Chapter 4117. * * * This authority must necessarily include the power to interpret the Act to achieve its purposes.' *Lorain City Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 260, 533 N.E.2d 264, 267. Although we do not often readily question a decision SERB has made, our willingness to defer to SERB is not unlimited. When, as here, a genuine controversy exists regarding when a ULP 'occurs,' SERB should be required to give some explanation of its finding of untimeliness." (Footnote omitted.) *Id.*

With these principles in mind, we turn to the substantive issue herein, namely, the legal effect of accretion by amendment of certification of a bargaining unit. Manifestly, R.C. Chapter 4117 contains no express provision providing for changes to existing bargaining units, which quite logically will likely occur during the three-year span of the typical collective bargaining agreement. To be sure, jobs inevitably change over the course of time and this is especially the case in the public sector. See Jacquelin F. Drucker, Collective Bargaining Law in Ohio (1993) 228, Section 5.17. Because of these special circumstances, SERB utilized its rulemaking power under R.C. Chapter 4117 to promulgate Ohio Adm.Code 4117–5–01. This administrative provision contains several procedural and substantive rules for changes to existing units. It states in pertinent part:

"(E) In the absence of a question of majority representation, a petition for clarification of an existing bargaining unit or a petition for amendment of certification may be filed by the exclusive representative or by the employer. The purposes of such petitions are:

"(1) For amendment of certification, to alter the composition of the unit by adding, deleting, or changing terminology in the unit description;

"(2) For clarification of a unit, to determine whether a particular employee or group of employees is included or excluded from the unit based upon the existing unit description and the duties of the employees in question.

" * * *

"(G) When a petition to amend certification seeks the addition ·of a group of employees to the existing unit, such addition may be permitted only if the number of employees to be added is substantially smaller than the number of employees in the existing unit."

Under these rules, then, official changes to existing units may be accomplished by unit clarification or amendment of certification. The former is essentially a ruling by SERB that a position is already covered by the wording of the existing unit description. The latter is a ruling by SERB that a position may be added or accreted to the unit under the criteria established by SERB to prevent dilution of representation. The attendants here were accreted by amendment to the unit description under Ohio Adm.Code 4117–5–01(G), apparently satisfying the qualitative and quantitative tests established by SERB.

There being no statute or rule specifying the legal effect of amendment of certification, the parties litigated the issue before SERB, which essentially established standards for accretions through its adjudicative order. In its order, SERB noted that at the federal level, unless there is a so-called *Globe* election,[2] the National Labor Relations Board ("NLRB") allows addition only of employees by unit clarification if the jobs of those employees did not exist prior to bargaining. This is done on the theory that the employees are functionally in the unit anyway but were not formally included because of evolving job classifications. By contrast, SERB's rules additionally allow accretions by unit amendment.

Because of these different rules on unit alteration, SERB declined to follow federal precedent[3] in lockstep fashion, instead attaching more significance to the

---

**2.** A "Globe election" refers to the case of *Globe Machine & Stamping Co.* (1937), 3 N.L.R.B. 294. It permits the employees voting to get into the bargaining unit to vote not only for the specific union that is to represent them, but also for the specific bargaining unit that they want to be a part of under the collective bargaining agreement.

**3.** The SERB hearing examiner pointed out that the issue of mid-term bargaining at the federal level was resolved by the NLRB in *Federal–Mogul Corp.* (1974), 209 N.L.R.B. 343, 85 L.R.R.M. (BNA) 1353, 1974 WL 4846. In that case, which involved a Globe election and the subsequent treatment·of the "Globed" employees as employees subject to the existing collective bargaining agreement, a majority of the NLRB found that forcing the new employees into an existing contract without any correlative duty to bargain mid-term would deprive them of the opportunity to negotiate, and would be tantamount to imposing an agreement on them in contravention of the fundamental premise of the bargaining Act—private bargaining of labor matters. By contrast, the *Federal–Mogul* dissent found that the "Globed" employees were

problem of unit over-fragmentation inherent in the public sector, as opposed to individual employee rights to bargaining. SERB thus held:

"[W]e will not automatically require mid-term bargaining for accreted employees in every circumstance where the NLRB has required it, nor will we automatically deny bargaining in every circumstance where the NLRB has denied it.

"Where employees are added to a unit through SERB's unit clarification procedure, we will not normally require bargaining. However, where they are added pursuant to Rule 4117–5–01(G) and a contract is in effect, we will sometimes require mid-term bargaining, but only in limited circumstances. In those cases where working conditions already settled by the existing collective bargaining agreement could be reasonably and sensibly applied to the newly added classifications, we will treat the existing contract as an agreement in advance with respect to the newly-added employees, and the accretion will trigger no additional bargaining of terms. However, in those circumstances where substantial terms and conditions of employment are involved, and where the provisions of the existing contract cannot be reasonably and sensibly applied to the newly-added classifications, then the employer and employee organization must bargain about contract modifications. This limited bargaining obligation is only for the period of time left until the existing collective bargaining agreement expires."

SERB consequently held that Kent State's application of the contract wage plan, the contract laundry policy and the previously implemented vehicle inventory procedure was substantively reasonable and sensible. Contrarily, AFSCME asserts on appeal that none of these important employment issues was bargained-for in advance *for these particular employees*, and thus should not be applied to what is essentially a brand new labor relationship. AFSCME maintains that the contract is "silent" regarding parking attendants or their interests, for they are not even mentioned. Thus, AFSCME seeks a ruling from this court that mid-term bargaining should be required for such accretions. Moreover, AFSCME posits alternatively that SERB's own application of its newly minted "substantial term of employment" rule is nonsensical, because this case involves *wages* and there is absolutely no term or condition of employment more "substantial" than wages.

We agree with SERB that there is a compelling justification to depart from established federal labor practice. Quite obviously, SERB's own rule additionally allowing accretions by unit amendment expands the scope of options for the

---

voting not only for the existing union but also for automatic application of the existing collective bargaining agreement. The dissenters thus found no duty to bargain.

parties in the collective bargaining process. We view this flexibility positively and think it will serve to better facilitate the mutual interests of labor and management alike in public sector collective bargaining.

As illustrated by the well-reasoned opinion of the Iowa Supreme Court in *Dubuque v. Pub. Emp. Relations Bd.* (Iowa 1983), 339 N.W.2d 827, 833, there are requirements unique to the public sector, such as yearly fixed government budgeting for instance, that necessitate a careful tailoring of the vagaries of the collective bargaining laws to the situation at hand. Here, SERB has formulated a rule that fosters choice in the collective bargaining context.

Our conclusion is premised on the assumption that if employees seek to be added to an existing unit while retaining the right to bargain, they may always seek a Globe election, which would have the same effect here as it would under *Federal–Mogul Corp.* (1974), 209 N.L.R.B. 343, 85 L.R.R.M. (BNA) 1353, 1974 WL 4846. That is, the employer would have a mid-term obligation to bargain with the elected union on the disputed mandatory subjects of bargaining as defined in *Lorain, supra.* In practical effect, this would mean that the public employer in the Globe election context would have a broad obligation to bargain with the new employees, as opposed to the very narrow obligation to bargain in the accretion by amendment context.

In the final analysis, then, we find that SERB has expanded the options available to those negotiating collective bargaining agreements in a fashion that comports with one of the purposes of the Act—to promote orderly, efficient and peaceful resolution of labor issues through the private bargaining under governmental supervision by SERB.[4] The standard formulated by SERB prohibits the employer from squeezing the employee into a "garment that does not fit," as SERB put it. It also allows the parties the luxury of taking an existing contract off the rack, and if it is a good fit, buying into immediate coverage without costly tailoring. We think that SERB has justified its order and that its ruling should be accorded due deference.

 In the instant case, the union and the accreted employees should have been aware that the labor unit for which they petitioned had in its contract a so-called "zipper clause"[5] prohibiting mid-term bargaining. While there is not

---

**4.** While accretion may be somewhat less desirable here because of an automatic application of the existing agreement against this particular employee organization, we note that sometimes new employees want very badly to be part of an agreement in place as it stands. See, *e.g.,* *Dubuque, supra.* Because SERB has *expanded* the options available to alter units, we are not driven by the concern that accretions will be more difficult and lead to over-fragmentation. See *Wausau School Dist. Maintenance & Custodial Union v. Wisconsin Emp. Relations Comm.* (1990), 157 Wis.2d 315, 459 N.W.2d 861.

**5.** Article 2(A) of the bargaining agreement provides, in part:

abundant precedent on this type of clause in Ohio, and while federal courts have restrictively interpreted anything which purports to bargain away precious collective bargaining rights, we note that in *Ohio Council 8, AFSCME, AFL–CIO v. Kent State Univ.* (Nov. 1, 1991), Portage App. No. 90–P–2267, unreported, 1991 WL 230044, a unanimous Eleventh District Court of Appeals affirmed a labor arbitrator's award governing the instant dispute and expressly ruled on the "zipper clause" in question. There, the appellant, AFSCME, filed a grievance contesting Kent State's actions and raised the same arguments that are presented in the instant unfair labor practice proceeding. The appellate court found that the grievance arbitration award was not "unlawful" under R.C. Chapters 2711 and 4117, because the arbitrator held that Ohio law did not provide for mid-term bargaining after an accretion by unit amendment, and the so-called "zipper" clause contained in the collective bargaining agreement was enforceable to preclude negotiations on bargainable subjects. Absent any persuasive counter-vailing argument from AFSCME, we find the conclusion of the Eleventh District Court of Appeals persuasive on this score. The attendants were subject to this clearly worded clause after accretion.

### III

Having found that the standard adopted by SERB should be afforded deference and should be enforced by this court, we turn to AFSCME's final argument that SERB's application of this standard was erroneous because Kent State acted with neither reason nor sensibility on the contested terms of employment. We cannot agree.

With respect to wages, the record discloses only that Kent State "slotted" the pay grade 3 attendants into a correlative pay grade 3 contract rate, just as it did other employees that were similarly situated. As conceded by AFSCME, the record does not make clear just what this meant in terms of actual dollars. This slotting treatment was, therefore, foreseeable under the contract.

As for the 1987 and 1988 salary increases and bonuses, we agree with the trial court that, since the attendants enjoyed correlative civil service wage or step increases while they were exempt in 1987 and 1988 from the benefits and burdens of the collective bargaining agreement, giving them additional contract wage increases would not be reasonably contemplated. The express language of the

---

"This Agreement shall constitute the entire Agreement between the parties setting forth their entire understanding on all matters, * * * and no other matters may be made the subject of collective bargaining during the term of this Agreement. Existing work practices, policies, procedures, rules and employee benefits not specifically modified or discontinued by the express provisions of this Agreement shall remain in full force and effect unless and until modified or discontinued by the University."

contract limited those contractual increases to workers then in the unit.[6] We find no language in the contract demonstrating that retrospective application of these contract wage benefits would be undertaken after accretion.

■ Likewise, in dealing with the laundry service issue for attendant uniforms, again the express terms of the contract only provide such a benefit for food service workers, which on the record we have before us, appear to be in a class all by themselves, because they must have hygienic clothes on a daily basis for health purposes. The facts presented in the record have not justified any special treatment as to uniforms for the attendants in light of the contract.

■ Last, in terms of the new vehicle inventory procedure, we agree that it is a weak employer argument which treats these unarmed attendants like university police officers who can defend themselves from attack in a remote parking lot. By all accounts, these attendants were subject to the new policy *before* being accreted into the unit. They could foresee that this would continue under the new contract. Therefore, there is no evidence in the record upon which this court can come to the conclusion that this was a "substantial" change in procedures.

Because we cannot find that the court abused its discretion in affirming this application of law to facts under the R.C. 119.12 substantial evidence test, AFSCME's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

JOHN C. YOUNG and CLOSE, JJ., concur.

---

6. Specifically, Articles 48(d), (e) and (f) all provided that such wages were to be given only to "each employee on the active payroll as of" February 4 on each successive year.